UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YOURK
------------------------------------------------------------------------x
MILFORD BENJAMIN MAXWELL,                          :
                                                   :
                      Plaintiff,           :        08 CV 3583 (HB)
                                                   :        **OPINION & ORDER**
        -against-                                 :
                                                   :
NEW YORK UNIVERSITY and                            :
CHRIS CONNELLY                                     :
                                                   :
                      Defendants.          :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

This case involves the Military Selective Service Act (the "MSSA"), an infrequent subject of federal litigation since the Vietnam War era. *Pro se* Plaintiff Milford Maxwell ("Maxwell") initiated this action against Defendants New York University ("NYU") and Chris Connelly ("Connelly" and, collectively with NYU, "Defendants"), an employee in NYU's Office of Financial Aid. Maxwell alleges that NYU's cancellation of his $16,000 financial aid award for the 2005-06 academic year violated the MSSA and the Americans with Disabilities Act (the "ADA") and he seeks $177,000 in damages. Defendants move for summary judgment pursuant to Fed. R. Civ. Pro. 56. Maxwell separately moves for an order holding NYU's counsel in contempt or, in the alternative, imposing discovery sanctions on Defendants. For the following reasons, Defendants' motion for summary judgment is GRANTED and Maxwell's motion for civil contempt or discovery sanctions is DENIED.

### I. FACTUAL BACKGROUND

In September 2005, Maxwell enrolled at NYU's School of Continuing and Professional Studies ("SCPS") for the 2005-06 academic year.[1] Defs.' 56.1 Stmt ¶4. In connection with his enrollment, Maxwell completed and submitted a Free Application for Federal Student Aid ("FAFSA") and was preliminarily determined to be eligible to receive a scholarship from SCPS,

---

[1] The factual background set forth herein is largely derived from Defendants' Statement of Facts pursuant to Local Rule 56.1(a) ("Defs.' 56.1 Stmt.") which summarizes the facts relevant to this dispute and relies upon the sworn declaration of Christopher Connelly ("Connelly Decl."), certain exhibits thereto and the transcript of Maxwell's October 28, 2009 deposition ("Maxwell Tr."). Maxwell has submitted no counter-statement of facts pursuant to Local Rule 56.1(b). However, the relevant facts are not generally disputed and Defendants' account of them is largely corroborated by the allegations in Maxwell's Amended Complaint and the attachments thereto.

a federally funded Pell Grant, and state and federal student loans that together totaled $18,200 in financial assistance.[2] *Id*. at ¶6; Am. Compl. Ex. 1.

To determine a student's eligibility for federal financial aid, when processing a male student's FAFSA the Department of Education (the "DOE") cross-checks the student's social security number against the database of men who have registered with the Selective Service System ("Selective Service").  Defs.' 56.1 Stmt. ¶6; *see also* 20 U.S.C.A. § 1091(n).  In the letter dated September 29, 2005 that notified Maxwell of his preliminary eligibility for $18,200 in financial assistance, NYU also informed Maxwell that "[t]he results of your [FAFSA processing] indicate that you have one or more issues that must be resolved before your federal aid or need based aid can be disbursed."  Connelly Decl. Ex. 1.  Namely, NYU advised Maxwell that the DOE had notified the school "that the federal Selective Service System [had] not confirmed [his] registration or exemption status" and that if Maxwell did not provide adequate documentation explaining why he was not registered he would "not be eligible for federal/institutional financial aid." *Id*.  On January 26 and February 6, 2006, NYU sent follow-up letters to Maxwell reiterating that he needed to either confirm that he had registered with Selective Service or document the reason(s) why he was exempt from doing so.

On February 21, 2006, Maxwell wrote the following to NYU's Office of Financial Aid:

> 1. I am 43 years old. The cut-off age is 26 for applying to selective service
> 2. During whatever period of time that I may have been eligible a document was mailed to an address. The letter was undeliverable
> 3. There is no draft at this time. The Selective Service System was set up for a time period when the law didn't encompass a volunteer army
> 4. Under paragraph (g) [of Section 12 of the MSSA] [i]t is a Federal law that no rights, privileges, or benefits can be denied because of this issue
> 5. I don't qualify for Selective Service today. I've never qualified for Selective Service at anytime [sic] in my life
> 6. The Draft of Selective Service issue is a political football that's been kicked around forever[.]  It's been on again / off again many times[.]  And at this time the point is legally "MOOT"
> 7. Paragraph (g) of the Federal Law clearly and in legal definition states what that means and how the moot ness [sic] is to be interpreted.

Connelly Decl. Ex 4; Am. Compl. Ex. 5.  Enclosed with his February 21, 2006 letter, Maxwell sent NYU a letter he had received from Selective Service advising Maxwell that Selective Service records indicated that he was not registered and that Selective Service had "sent one or

---

[2] Pursuant to a revised award letter sent to Maxwell on February 6, 2006, Maxwell's total financial aid award was reduced to $16,201. Connelly Decl. Ex. 2.

more pieces of correspondence informing [Maxwell] of the requirement to register, which were not returned as undeliverable." Am. Compl. Ex. 5A. The letter from Selective Service further advised Maxwell that pursuant to Section 12(g) of the MSSA one who has not registered for the draft cannot be denied federal rights or benefits if he can demonstrate that his failure to register was not knowing or willful. *Id*. Maxwell contends that months later he sent NYU a subsequent letter from Selective Service, dated July 5, 2006, which stated that "[n]o notices were sent to [him] by the Selective Service System regarding the requirement to register" but that "Selective Service is not required to notify men of their obligation to register." Maxwell sent no other documentation to NYU regarding his compliance with the MSSA. Maxwell Tr. 25-27.

On March 31, 2006, Connelly wrote to Maxwell to inform him that NYU was obligated to cancel his federal financial aid award as a result of his failure to document that he had registered with Selective Service or that he was exempt from doing so. Connelly Decl. Ex. 4; Am. Compl. Ex. 12. NYU then returned Maxwell's Pell Grant and his two Stafford Loans to the federal government and, pursuant to NYU policy, cancelled his $4,500 scholarship. Defs.' 56.1 Stmt. ¶20. NYU did not return a $825 grant Maxwell had received from the New York State Department of Vocational and Educational Services for Individuals with Disabilities ("VESID") and applied the amount of that grant to Maxwell's tuition bill. *Id*. at ¶21.

Maxwell has never paid NYU for his tuition for the 2005-06 academic year, and after his account was referred to a collection agency in 2007, Maxwell filed this action on April 15, 2008. Am. Compl. Ex. 9. In his Amended Complaint Maxwell alleges that he "never qualified for the draft or Selective Service due to institutionalization between the ages of 18 and 26." Am. Compl. ¶11. At his deposition, Maxwell testified that he had been incarcerated for some portion of the period between his 18th and 26th birthdays, but acknowledged that he did not inform NYU of this fact during the time he was enrolled at the university. Maxwell Tr. 25-27; 34-35. Defendants filed a counterclaim against Maxwell seeking to recover the $20,915.09 that they contend Maxwell still owes the university, the majority of which presumably would have been covered by Maxwell's financial aid award had it not been cancelled by NYU.

Defendants initially filed their motion for summary judgment on January 26, 2009, and Maxwell opposed the motion on the basis of Fed. R. Civ. P. 56(f), claiming that he had been denied discovery that would have led to facts essential to his opposition. On March 18, 2009, the Court reconsidered its earlier denial of Maxwell's motion to compel, ordered Defendants to

3

produce documents responsive to certain of Maxwell's discovery requests, and authorized Defendants to make an election to either file a revised motion for summary judgment or stand upon their initial filing.  Defendants elected to stand on their initial motion.  On April 17, 2009 Maxwell informed the Court that he "elect[ed] to renew the existing opposition to Plaintiff's [sic] Motion for Summary Judgment" and thereafter Defendants filed their reply.  On May 5, 2009 after Defendants had filed their reply, Maxwell filed a "renewed opposition" in which he contends principally that the Seventh Amendment to the U.S. Constitution guarantees him a right to a trial by jury and that certain factual issues, including whether the funds received by NYU from the "U.S. Military, its affiliates; and from various foreign governments in the Middle East theatre of our two present wars" have "a direct bearing on [his] being denied access to an education" under the MSSA.  On April 20, 2009, Maxwell moved to hold NYU's counsel in contempt of court for alleged failure to comply with this Court's March 18, 2009 Order.

## II. LEGAL STANDARDS

### A. Summary Judgment

"Summary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict." *United Nat'l. Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 355 (2d Cir. 1993).  A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Id.* at 247-48.  Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In showing the existence of a genuine issue of material fact, "the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004).  That is, he "must come forward with evidence sufficient to allow a reasonable jury to find in [his] favor."  *Brown*, 257 F.3d at 252; *see also* Fed. R. Civ. P. 56(e)

("When a motion for summary judgment is made and supported as provided in [the] rule, . . . the adverse party's response . . . must set forth *specific facts* showing that there is a genuine issue for trial.") (emphasis added).

### B. Civil Contempt and Discovery Sanctions.

A party who seeks to hold another in contempt of court must meet a high bar. "A contempt order is warranted only where *the moving party* establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict." *Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009) (quoting *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995) (emphasis in original). "Specifically, the *movant* must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner. *Id.* (citation and inter quotation marks omitted)

A district court has wide discretion to decide whether to impose discovery sanctions pursuant to Fed. R. Civ. P. 37 and to fashion such sanctions if the court determines they are warranted. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006); *Shaffer v. RWP Group, Inc.*, 169 F.R.D. 19, 24 (E.D.N.Y. 1996).

### III. DISCUSSION

#### A. Summary Judgment

##### 1. Violation of the Military Selective Services Act

Maxwell contends that Defendants violated Section 12(g) of the Military Selective Services Act ("MSSA") when they cancelled his financial aid award as a result of his failure to register with Selective Service. Section 12(g) provides that no person may be denied a right, privilege or benefit under federal law by reason of his failure to register with Selective Service if he is no longer required to register and can show by a preponderance of the evidence that his failure to register was not knowing and willful. 50 App. U.S.C. § 462(g). Defendants assert two arguments in support of their motion for summary judgment on Maxwell's claim under the MSSA. First, they contend that there is no express private right of action under Section 12(g) and it would be improper for the Court to find one by implication. Second, they argue that even if a private right of action does exist, Maxwell's claim fails because NYU merely complied with its obligations under the statute and appurtenant regulations to cancel Maxwell's federal aid.

Although the existence of a private right of action under Section 12(g) is a close question and one of first impression, it is one I need not reach. While there are instances where federal jurisdiction may be invoked to vindicate the rights conferred by Section 12(g) following a school's determination that a failure to register renders the plaintiff ineligible for federal financial aid, such a plaintiff must first exhaust his administrative remedies. Maxwell did not do so here. As a consequence, even though it appears that NYU may have technically violated the applicable regulations because it cancelled Maxwell's federal financial aid three months early, this Court is unable to reach or resolve the merits of his claim.

a. *Statutory and Regulatory Framework*

Originally enacted in 1948, the MSSA requires every male citizen of the United States to register with Selective Service unless he is subject to an enumerated exemption. 50 App. U.S.C.A. § 453. In 1975, President Ford discontinued draft registration, deactivating the Selective Service System, the institution responsible for the draft registration process. *See Elgin v. United States*, 594 F.Supp. 2d 133, 136 (D. Ma. 2009). In 1980, Congress reinstated the registration requirement and President Carter issued a Proclamation requiring male citizens and residents born after February 1, 1960 to register with Selective Service after turning 18. Proclamation 4771, 45 Fed. Reg. 45,247 (July 2, 1980).

In 1982, Congress passed amendments to the MSSA which provide, *inter alia*, that a person who is required to register with the Selective Service but fails to do so "shall be ineligible for any form of assistance or benefit provided under title IV of the Higher Education Act of 1965 [the "HEA"]."[3] 50 App. U.S.C. § 462(f) ("Section 12(f)"). The purpose of the 1982 Amendment was "to deny federal educational assistance to those young men who were required to register for the draft, yet had not done so." *Alexander v. Trustees of Boston University*, 766 F.2d 630, 632 (1st Cir. 1985). By so conditioning students' eligibility for federal financial aid "Congress sought, not to punish anyone, but to promote compliance with the draft registration

---

[3] The sponsor of the 1982 amendments was Congressman Gerald Solomon, and these amendments have been referred to as the "Solomon Amendment." *See Alexander v. Trustees of Boston University*, 766 F.2d 630, 631 (1st Cir. 1985). But the 1982 amendments should not be confused with the more recent, and perhaps better known "Solomon Amendment," which was enacted in 1994 and permits the Department of Defense to deny federal funding to universities that deny campus access to military recruiters. *See* 10 U.S.C. §983. *That* Solomon Amendment has nothing to do with this case. To avoid confusion, I refer to the 1982 amendment to the MSSA, which is relevant here, as the "1982 Amendment."

requirement and fairness in the allocation of scarce federal resources." *Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841 (1984) (footnote omitted) (holding, *inter alia*, that Section 12(f) is not an unconstitutional bill of attainder).  An initial draft of Section 12(f) was revised to ensure that implementing regulations afforded "due process to an individual who has complied but whose compliance may not be immediately verifiable." H.R. CONF. REP. NO. 97-749, 174, *as reprinted in* 1982 U.S.C.C.A.N. 1569, 1579.

In 1986, Representative Gerald Solomon, sponsor of the 1982 Amendment, proposed another amendment to the MSSA originally intended to address a narrow "catch 22" in which some young veterans found themselves.  132 CONG. REC. H6356-02 (daily ed. Apr. 15, 1986) (statement of Rep. Solomon).  As originally drafted, Section 12(f) contained no exceptions. Some veterans honorably discharged prior to their 26th birthday and unaware of their obligation to register thus found themselves without access to federal educational assistance as a result of innocent violations of the MSSA.  *Id*. Representative Solomon proposed to exempt from Section 12(f)'s bar on Title IV assistance under the HEA "any person discharged under honorable conditions from the armed forces."  *Id*.  Ultimately, the exemption was revised to include all federal benefits and cover any person who was no longer required to register and who could show that his failure to register was not knowing or willful.  As noted in a House Conference Report, the provision was added to the MSSA, because the conferees "did not believe it would be fair to extend [the bar on entitlement to federal aid] to an individual who honestly believed he did not have an obligation to register." H.R. CONF. REP. NO. 99-1001, 546, *as reprinted in* 1986 U.S.C.C.A.N. 6529, 6605.  Section 12(g) was adopted in its current form. National Defense Authorization Act for Fiscal Year 1987, Pub. L. No. 99-661, §1366, 100 Stat. 3816 (1986).

Pursuant to statutory mandate, the DOE has adopted regulations that govern the procedures to determine a student's compliance with the MSSA and thus his eligibility for federal financial aid under Title IV of the HEA.  When the DOE processes a male student's FAFSA, it cross-references the student's social security number with the Selective Service System's database of registrants. 34 C.F.R. §668.37(b)(1); *see also* 20 U.S.C.A. § 1091(n) (providing that to enforce the Selective Service registration requirements the DOE must conduct database matches with the Selective Service).  If the cross-reference does not confirm that the student has registered, the student is allowed to establish that he is entitled to federal financial aid by showing, *inter alia*, that he is registered or that he is exempt.  34 C.F.R. §668.37(c).  It is

7

the educational institution who makes this determination as an initial matter, and pursuant to the regulations, the school must give a student "at least 30 days, or until the end of the award year, whichever is later, to provide evidence to establish" his eligibility.[4]  34 C.F.R. §668.37(c)(2).

The regulations also set the standards that apply to the educational institution's eligibility determination.  A student may establish that, notwithstanding his failure to register, he is eligible for Title IV assistance in one of several ways, including demonstrating "by clear and unambiguous evidence to the institution that . . . he was unable to present himself for registration for reasons beyond his control such as hospitalization, incarceration, or institutionalization"[5] or showing that he did not knowingly and willfully fail to register.  34 C.F.R. §668.37(c)-(e).  A school may determine that a student's failure to register was not knowing and willful *only* if the student submits to the school "an advisory opinion that the Selective Service System that does not dispute the student's claim" and the school does not have "uncontroverted evidence that the student knowingly and willfully failed to register." 34 C.F.R. §668.37(e).  A student denied financial assistance may seek an administrative hearing with the DOE. 34 C.F.R. §668.37(f)(1).

    b.   *Private Right of Action and Exhaustion of Administrative Remedies*

Defendants argue that Section 12(g) of the MSSA does not authorize an implied private right of action.  "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  Thus, where it is not spelled out in the statute itself, the "judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right, but also a private remedy." *Id.*  Unless the statute reveals congressional intent to create a private remedy, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a matter of public policy." *Id.*  The analysis must begin with the presumption that Congress did not intend one. *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007); *see also Touche Ross & Co. v. Redington,* 442 U.S. 560, 571, (1979) ("[I]mplying a private right of

---

[4] An "award year" is "the period of time from July 1 of one year through June 30 of the following year." 34 C.F.R. §§ 600.2, 668.2.

[5] The source of the exemption for incarceration or institutionalization is not found in the MSSA, but rather is found in President Carter's Proclamation 4771, which provides that persons who would have been required to register but for a statutory exemption or "but for some condition beyond their control such as hospitalization or incarceration, shall present themselves for registration within 30 days after the cause for their exempt status ceases to exist or within 30 days after the termination of the condition which was beyond their control." Proclamation 4771, 45 Fed.Reg. 45247.

action on the basis of congressional silence is a hazardous enterprise, at best."). "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.' " *Alexander,* 532 U.S. at 289 (quoting *California v. Sierra Club,* 451 U.S. 287, 294 (1981)). However, a private right of action may be found where Congress has drafted a statute in explicit rights-creating terms "with an unmistakable focus on the benefited class," *Cannon v. University of Chicago,* 441 U.S. 677, 692, n. 13 (1979), such that "the statute manifests an intent 'to create not just a private *right* but also a private *remedy.*"[6] *Gonzaga University v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Alexander,* 532 U.S. at 286).

I note first that courts have consistently "refused to find a private right of action implied in the Higher Education Act for a student borrower against the educational institution, the lender, or the loan guarantee agency to remedy alleged violations of the Higher Education Act in granting or denial of federal financial aid." *White v. Apollo Group*, 241 F.Supp.2d 710, 713 (W.D. Tex. 2003) (citing *L'ggrke v. Benkula,* 966 F.2d 1346, 1347-48 (10th Cir. 1992)); *see also Slovinec v. Depaul University*, 332 F.3d 1068, 1069 (7th Cir. 2003) (per curiam); *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484-85 (9th Cir. 1995); *Waugh v. Connecticut Student Loan Fd.,* 966 F.Supp. 141, 143 (D. Conn. 1997); *Moy v. Adelphi Inst., Inc.,* 866 F.Supp. 696, 704-05 (E.D.N.Y. 1994). In large measure, courts have reached this conclusion based upon the DOE's broad authority to administratively enforce an educational institution's compliance with the HEA. *See*, *e.g*., *L'ggrke,* 966 F.2d at 1347-48 (citing 20 U.S.C. § 1094(c)(2)(a); 34 C.F.R. §§ 668.84(a), 668.85(a)(1), § 668.86(a)). "Where a statute provides an administrative enforcement mechanism, the presumption is that no private cause of action is intended." *White,* 241 F. Supp. at 713. Under the HEA, an educational institution operates as a fiduciary to the DOE, *see* 34 C.F.R. §668.82, but courts have held that the fiduciary duty only

---

[6] "Over the years, the Supreme Court has come to view the implication of private remedies in regulatory statutes with increasing disfavor," moving from the four-factored analysis set forth in *Cort v. Ash,* 422 U.S. 66 (1975), to a singular focus on the "question of whether congressional intent to create a private cause of action can be found in the relevant statute." *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 618 -619 (2d Cir. 2002) (citing, e.g., *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15-16 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575 (1979); *Alexander v. Sandoval,* 532 U.S. 275, 286-87, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)). The four factors identified by the Supreme Court in *Cort* and relied upon by the Court in *Cannon* are: (1) legislative intent, (2) the consistency of the remedy with the underlying purposes of the legislative scheme, (3) whether the plaintiff was a member of the class for whose benefit the statute was enacted, and (4) whether the cause of action is one traditionally relegated to state law. *Cort*, 422 U.S. at 78.

runs between the school and the government—third parties, like students, do not have standing to sue a school for breach of its obligation to award and disburse federal aid in strict compliance with the HEA. *Radin v. Albert Einstein College of Medicine of Yeshiva University*, 04 Civ. 704 (RPP), 2005 WL 1214281 (S.D.N.Y. May 20, 2005) (citing *Moy*, 866 F. Supp. at 708). This conclusion also makes practical sense as a contrary result "has the potential to occasion a floodwater of federal actions by students perceiving themselves to be aggrieved." *L'ggrke*, 966 F.2d at 1348 n. 4.

Similar considerations apply to the question of whether Congress intended to authorize a private right of action against a university for alleged violations of Section 12(g). The DOE has authority to impose fines and suspend or terminate an educational institution's participation in Title IV programs for violations of "a statutory provision of *or applicable to* Title IV of the HEA [or] any regulatory provision prescribed under that statutory authority." 34 C.F.R. §668.84 (fines) (emphasis added); *see also* 34 C.F.R. §668.85 (suspensions); 34 C.F.R. §668.85 (terminations). Both Sections 12(f) and (g) of the MSSA are statutes "applicable to Title IV of the HEA" and the DOE regulations derive from that authority.

But the question Defendants urge me to answer in the negative—whether Congress authorized a private right of action to enforce Section 12(g)—is distinct from whether such a right lies under the HEA. For one thing, unlike the HEA which "focus[es] on the person regulated" by prescribing the criteria by which a school may determine which students are eligible for federal financial aid, Section 12(g) focuses on the "individuals protected" by guaranteeing a student the right not to be denied federal benefits for an innocent failure to register. The question of whether Section 12(g) supports a private right of action is a question of first impression with implications that resonate outside the context of rights to federal higher educational assistance. But it is ultimately one I need not decide here because it is clear that in the context of Title IV assistance any such action must begin administratively. A student's failure to exhaust the administrative remedies made available to him precludes consideration of the merits of his claim in federal court. That said, I would not be so quick, as NYU apparently is (see footnote below), to reject the concept that a private right of action is available to plaintiffs under Section 12(g).[7]

---

[7] Several features of the statute suggest a congressional intent to create a private right of action to vindicate the rights created by Section 12(g). First, the language of Section 12(g) is decidedly "rights-

10

Section 12(g) protects an innocent non-registrant's entitlement to all manner of federal rights and benefits, but when the benefit at issue is federal financial aid under Title IV, Section 12(g) must be read in conjunction with Section 12(f). When read together, it becomes clear that in the higher education context an action to vindicate the rights conferred by Section 12(g) must start with exercise of the administrative procedures established by the DOE regulations, which themselves actualize Congress' concern for due process. *See* 20 App. U.S.C. §462(f)(4) (providing that regulations must require that a student be given notice of a proposed denial and a suitable period to establish compliance with the MSSA's registration requirement). Consistent with this approach, the regulations synthesize the ineligibility criteria of Section 12(f) with Section 12(g)'s exception for innocent failures to register, providing an administrative mechanism to enforce the rights created by Section 12(g) in the context of Title IV benefits.

"The general rule is that a party may not seek federal judicial review of an adverse administrative determination until the party has first sought all possible relief within the agency itself." *Beharry v. Ashcroft*, 329 F.3d 51, 56 (2d Cir. 2003) (citing *Howell v. INS,* 72 F.3d 288, 291 (2d Cir. 1995) (internal quotation marks omitted). "[E]xhaustion serves myriad purposes, including limiting judicial interference in agency affairs, conserving judicial resources, and preventing the 'frequent and deliberate flouting of administrative processes [that] could weaken

---

creating." Section 12(g) uses the same "no person shall be denied" phrasing found in both the Voting Rights Act of 1965 and Title IX of the Education Amendments of 1972, each of which the Supreme Court has held to authorize a private right of action. *Cannon*, 441 U.S. at 690; *Allen v. State Bd. of Elections*, 393 U.S. 544, 557 (1969). Second, the statute benefits a discrete class of individuals: namely men who are too old to register and have been denied federal benefits on the basis of an innocent and irremediable failure to register with Selective Service. *Cf. Elgin v. U.S.*, 594 F.Supp.2d 133, 139-40 (D. Ma. 2009) (finding that group of persons born after December 31, 1959 who did not register for selective service system is "easily ascertainable" for purposes of bill of attainder analysis). Third, the legislative history shows that Congressman Solomon proposed Section 12(g) to address the dilemma in which honorably discharged servicemen found themselves and the provision was subsequently expanded to encompass innocent non-registrants more generally, suggesting congressional intent to create a remedy to benefit the specific and discrete class of persons covered by the statute. Fourth, Section 12(g) expressly sets the quantum of proof—a preponderance of the evidence—that must be "shown" to establish relief. This suggests a right to *show* such proof to a tribunal with the power to grant the relief sought. On the other hand, in a footnote in *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 847 n. 3 (1984), the Supreme Court rejected without explanation the Selective Service System's argument that the hearing referred to in Section 12(f)(4) is subject to judicial review. The Court stated that "Congress has not provided a judicial trial to those affected by [Section 12(f) of the MSSA]." But that decision predates Congress' adoption of Section 12(g) which expressly grants rights to innocent non-registrants and establishes the quantum of proof that must be shown for the non-registrant to succeed.

11

the effectiveness of an agency.'" *Bastek v. Federal Crop Ins. Corp.*, 145 F.3d 90, 93-94 (2d Cir. 1998) (quoting *McKart v. United States,* 395 U.S. 185, 193-95 (1969)). Where a statute does not expressly require exhaustion, a court must "exercise discretion and 'balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion."[8] *Id.* (quoting *McCarthy v. Madigan,* 503 U.S. 140, 144 (1992)).

Although the exhaustion doctrine is "flexible and 'intensely practical,'" *Abbey v. Sullivan*, 978 F.2d 37, 44 (2d Cir. 1992) (quoting *Bowen v. City of New York*, 476 U.S. 467, 484 (1986)), the higher courts have identified criteria to guide my discretion. I must consider primarily whether (1) requiring exhaustion would occasion undue prejudice to subsequent assertion of a court action; (2) the administrative remedy is inadequate because the agency cannot give effective relief . . .[and] (3) the agency is biased or has predetermined the issue (also known as "futility")" *Bastek*, 145 F.3d at 95 n. 4. (internal quotation marks and citations omitted). Application of these criteria "must 'be guided by the policies underlying the exhaustion requirement.'" *Abbey*, 978 F.3d at 44 (quoting *McKart v. United States*, 395 U.S. 185, 193 (1969)). For example, "one of the doctrine's principal purposes is 'preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors.'" *Id*. (quoting *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975)).

Here, each of the foregoing criteria strongly weigh in favor of requiring students faced with an initial determination of ineligibility to exercise their administrative remedies—i.e.

---

[8] Pursuant to Section 13(b) of the MSSA, all "functions performed" pursuant to the MSSA are "exempt from operation of the Administrative Procedures Act" (the "APA"). 50 App. U.S.C. § 463(b). This does not, however, foreclose judicial review of administrative determinations made pursuant to the MSSA because the APA does not provide an independent grant of subject matter jurisdiction. *Califano v. Sanders,* 430 U.S. 99, 107 (1977). Rather, the general statutory grant of federal question jurisdiction, 28 U.S.C. §1331, confers jurisdiction on federal courts to review agency action "subject only to preclusion-of-review statutes created or retained by Congress." *Id.* The inapplicability of the APA to actions taken pursuant to the MSSA does, however, change the determination of when a student's eligibility would be considered "final" and subject to judicial review. Section 10(c) of the APA limits the "availability of the [judicial] doctrine of exhaustion of administrative remedies to that which the statute or rule clearly mandates" and the Supreme Court has held that where the APA applies, a district court cannot require a party to exercise an optional administrative appeal as a prerequisite to judicial review. *Id.* Where the APA does not apply, the judicial exhaustion doctrine applies. *Bastek v. Federal Crop Ins. Corp.*, 145 F.3d 90, 94 (1998).

soliciting an advisory opinion from the Selective Service System and, if necessary, demanding a hearing from the DOE—before filing suit in federal court. First, requiring exhaustion would not prejudice the student in a subsequent court action because nothing would prevent the court from making its own determination as to what a preponderance of the evidence shows. Second the applicable "agencies"—i.e. the DOE and the educational institution—are capable of granting the relief sought: namely, they may determine that the innocent non-registrant is eligible to receive federal aid. Indeed, they are likely capable of acting with far greater alacrity that a district court, and that inures to the student's benefit. Third, I have no reason to believe that any of the agencies involved in the eligibility determination are biased or inclined to prejudge a student's claim of innocence. I thus conclude that even if Section 12(g) does authorize a private right of action—a question I expressly decline to decide—a student who contends his failure to register was innocent must at the least exhaust the administrative remedies afforded him pursuant to 34 C.F.R. §668.37 before he may seek judicial review here.

This result must obtain even if the consequence is preclusion of judicial review of the merits of his claim. In *McGee*, *McGee v. United States*, 395 U.S. 185, 193 (1969), the Supreme Court counseled that the interests that favor exhaustion must be weighed "the harsh impact of the doctrine when it is invoked to bar any judicial review of a[n] [individual's] claims." *Id*. But there the High Court held that a student's failure to exhaust his administrative remedies before a local Selective Service board precluded him from asserting a conscientious objector defense to his criminal prosecution for refusing to be inducted into the military. If it is not "too hard a result" to require a criminal defendant to exhaust administrative remedies before he is entitled to assert a defense, it certainly is not too much to require a student to do the same before he may file suit for improper cancellation of his federal financial aid.

c. *Maxwell's Failure to Exhaust*

Turning to the facts of this case, the foregoing analysis compels me to conclude that Maxwell's claim under the MSSA fails as a matter of law. Maxwell failed to exhaust his administrative remedies because he did not seek a hearing before the DOE. The July 5, 2006 letter from Selective Service states that no notices were sent to Maxwell, which is some evidence that his failure to register was innocent. Furthermore, though far from conclusive, Maxwell's deposition testimony and an FBI background check suggest that he was incarcerated for a substantial portion of the period of time between his 18th and 26th birthdays, suggesting that his

failure to register may have been beyond his control. *See* Decl. of Nancy Kilson, dated December 19, 2008, Ex. 4. But even if the July 5, letter does constitute an advisory opinion of the Selective Service, he failed to seek the requisite DOE hearing. Even if there would otherwise be a triable issue of fact as to whether Maxwell's failure to register was innocent or due to factors beyond his control, Maxwell cannot bypass that administrative tribunal to have this Court decide the merits of his claim in the first instance.[9] As a consequence, there is no occasion for the question of whether Maxwell's failure to register was, or was not, knowing and willful to be adjudicated in this Court.

Maxwell's failure to exhaust also forecloses a potential challenge to the procedural defect in NYU's cancellation of his financial aid. It appears that NYU should have given Maxwell until the end of the "award year," i.e. June 30, 2006, to establish his eligibility for Title IV benefits. 34 C.F.R. §668.37(c)(2). Instead, the university cancelled his financial aid on March 31, 2006. However, the proper way for Maxwell to challenge this procedural defect was for him to seek a hearing before the DOE, not to wait two years until NYU had referred his tuition bill to a collection agency to file suit in this Court. Moreover, if the cancellation was in fact premature in violation of the regulations appurtenant to the HEA, it is within the DOE's authority to take such administrative action against NYU as it deems proper. Policing a school's compliance with the HEA falls in the first instance to the DOE, not to this Court. Because Maxwell failed to exhaust his administrative remedies his claim under the MSSA for improper cancellation of his federal financial aid fails as a matter of law. Accordingly, Defendants' motion for summary judgment on this claim is GRANTED.

### 2. Violations of the Americans with Disabilities Act

Maxwell's second cause of action alleges that Defendants violated the Americans with Disabilities Act (the "ADA") by *keeping* the $825 in educational benefits Maxwell received from the New York State Department of Vocational and Educational Services for Individuals with Disabilities ("VESID") while returning the balance of his financial aid award. Am. Compl. ¶13. Summary judgment must also be granted on this cause of action because no reasonable jury could find for Maxwell on this claim.

---

[9] The same analysis would not apply to a constitutional challenge to Section 12(g) or the implementing regulations or a challenge to an agency action that so exceeded statutory mandates as to be "basically lawless." *Oestereich v. Selective Service System Local Bd. No. 11, Cheyenne, Wyo.*, 393 U.S. 233, 238 (1968). Having thoroughly reviewed the facts surrounding the school's cancellation of Maxwell's financial aid, I am highly doubtful of the merit of any such claim here.

The ADA requires that qualified disabled individuals receive "reasonable accommodations" that permit them to have access to and take a meaningful part in public services and public accommodations. *Powell v. National Bd. of Medical Examiners*, 364 F.3d 79, 84-85 (2d Cir. 2004). In order to establish a violation under the ADA, a plaintiff must demonstrate that (1) he is a "qualified individual" with a disability; (2) that the defendants are subject to the ADA; and (3) that the plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of his disabilities. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

There is no question that NYU is subject to the ADA. A private university like NYU is a place of public accommodation subject to the ADA. *McInerney v. Rensselaer Polytechnic Institute*, 505 F.3d 135, 138 (2d Cir. 2007). The ADA does not, however, apply to individual school employees such as Connelly.[10] *Emerson v. Thiel College*, 296 F.3d 184, 188-89 (2d Cir. 2002).

Nevertheless, Maxwell fails to identify a genuine issue of material fact with respect to the other two elements of a claim under the ADA. Maxwell's opposition to Defendants' motion for summary judgment on his ADA claim is limited to a single assertion, i.e., that there is a triable issue of fact as to whether Defendants "did violate the [ADA] during the spring semester of 2006 when plaintiff was receiving disability services from the state funded agency VESID." This conclusory statement is insufficient to defeat Defendants' motion for summary judgment. *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) ("A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory.")

But even when the allegations in Maxwell's complaint are accepted, Maxwell fails to make out a *prima facie* case of disability discrimination. Those allegations can be generously construed to allege that Maxwell suffers from a mental disability. Maxwell alleges that he initially filed the instant complaint "while undergoing psychiatric care at Riker's Island Jail," that between the ages of 18 and 26 he was "institutionalized for medical reasons," and that he received financial aid from VESID. But identifying an impairment is not enough to satisfy the

---

[10] The fact that the ADA does not apply to individual school employees is an independent reason why Defendants' motion for summary judgment on Maxwell's ADA claim must be granted with respect to Defendant Connelly.

15

ADA's definition of "disability." Under the ADA, a disabled individual is one who suffers from "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A) (2000). Thus, a plaintiff also must identify a major life activity performance of which is substantially impaired as a consequence of the disability. *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002). Attending school qualifies as a major life activity. *Id.* But Maxwell's complaint contains no allegation that suggests his ability to attend school was impaired by his disability. Indeed, Maxwell testified at his deposition that not only did he never ask NYU to accommodate his disability, he needed no special accommodations. Maxwell Tr. 18-19. Maxwell does not allege that he was unable to attend NYU as a consequence of his impairment, but instead complains that he must pay for it. NYU has discharged its burden to provide competent evidence that shows the university cancelled Maxwell's financial aid on the basis of his failure to register for the draft and not on the basis of any impairment. Maxwell has not rebutted that showing with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Furthermore, the alleged act of disability discrimination of which Maxwell complains is that NYU *kept* his VESID grant and applied it to his tuition bill, but cancelled the balance of his financial aid. No reasonable jury could conclude from these fact that NYU discriminated against Maxwell on the basis of his disability. The ADA does not require a school to disburse financial aid to a student who has not shown he is entitled to it. The ADA only requires *reasonable* accommodations. *Powell v. National Bd. of Medical Examiners*, 364 F.3d 79, 88 (2d Cir. 2004). For the foregoing reasons, Defendants' motion for summary judgment on Maxwell's claim under the ADA is GRANTED.

### B. Civil Contempt and Discovery Sanctions

Maxwell separately moves for an order holding Defendants' counsel in contempt for her alleged failure to obey this Court's Order dated March 18, 2009 or, in the alternative, for discovery sanctions pursuant to Fed. R. Civ. P. 37. Because Maxwell fails to establish a sanctionable discovery violation or meet the high standard for civil contempt, this motion is DENIED.

The Court's March 18, 2009 Order directed Defendants to produce documents responsive to three of Maxwell's discovery requests (Request Nos. 10, 11, and 12) "to the extent such documents have not already been produced and are not otherwise protected from discovery."

Maxwell's discovery demands were somewhat unclear and so I specifically ordered Defendants to produce documents responsive to the requests as I interpreted them.

On April 13, 2009, after the Court granted an extension of time for the production, Defendants produced to Maxwell an additional 550 pages of documents. Decl. of Nancy Kilson, dated April 23, 2009 ("Kilson Decl."), ¶4. Defendants' counsel served these documents on Maxwell with a letter that stated they were responsive to Maxwell's Request No. 11, that Defendants had previously provided all documents responsive to Request No. 10, and that Defendants were "unable to locate any documents responsive to Request No. 12." *Id*. at Ex. 1.

Maxwell takes issue with two of Defendants' responses. First, Maxwell objects to the production of documents pursuant to his Request No. 10, which as originally drafted sought "[o]ther communications' runs containing entries relevant to the returning of financial aid grants and scholarships for Milford Maxwell during his tenure at New York University." The Court construed this request as a request for "documents pertaining to Defendants' return of Plaintiff's financial aid award." Maxwell now objects that he has not been "presented with communication runs." But to the extent that Maxwell seeks documents other than those "pertaining to the return of financial aid," his motion to compel was denied by my March 18, 2009 Order. Defendants have advised both Maxwell and the Court that all documents responsive to the request *as I interpreted it* have already been produced. Maxwell also objects to the production because it does not include documents pertaining to the fall semester of 2005. But Request No. 10 seeks documents pertaining to the *return* of Maxwell's financial aid award, which occurred in the spring of 2006. Consequently I have no reason to doubt the veracity of Defendants' representation that they have produced all documents responsive to Request No. 10.

Second, Maxwell objects to Defendants' response that they were "unable to locate" documents responsive to Request No. 12, which the Court construed to seek documents that "pertain to complaints filed with the Department of the Education against NYU related to return of financial aid based on a student's failure to comply with the [MSSA]." Defendants' counsel declares that she spoke with two managers in NYU's Office of Financial Aid, one of whom has held the position for 12 years, and neither could recall receiving any DOE complaints related to return of a student's financial aid based on his failure to comply with the MSSA. Kilson Decl. ¶ 11. Defendants' counsel further declared that there is no log or index of such complaints and

that review of each student's individual financial aid file would require an unreasonable expenditure of time and effort. In light of the steps that Defendants have already taken, I agree.

"[L]itigants have an obligation, when discovery is sought from them, to make *reasonable* efforts to locate responsive documents." *Adele v. Filene's Basement, Inc.* 2009 WL 855955, *8 (S.D.N.Y. 2009) (citing *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Redt. Employees Int'l Union,* 212 F.R.D. 178, 223 (S.D.N.Y. 2003)) (emphasis added). A complaint lodged against the university by the DOE is likely to be remembered by those in charge of administering financial aid at NYU. And even if such complaints were lodged, their relevance to Maxwell's claims is tenuous. Maxwell does not allege that NYU had a pattern or practice of wrongfully cancelling non-registrants' financial aid, and NYU has produced documents pertaining to both the cancellation of Maxwell's financial aid and their policies generally. Consequently, I conclude that Defendants adequately discharged their obligations pursuant to my March 18, 2009 Order and had no obligation to manually search thousands of individual student files for documents tangentially related to Maxwell's claim. Because Defendants reasonably complied with this Court's Order, Maxwell's motion for civil contempt or, in the alternative, discovery sanctions is DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. Plaintiff's motion to hold Defendants' counsel in contempt of court or, in the alternative, for discovery sanctions is DENIED. Having concluded that Maxwell's federal law claims must be dismissed, I decline to retain supplemental jurisdiction over Defendants' pendant state law counterclaim. 28 U.S.C. § 1367; *Matican v. City of New York,* 524 F.3d 151, 155 (2d Cir. 2008). The Clerk of Court is instructed to close this case and any open motions and remove this case from my docket.

SO ORDERED
June ___, 2009
New York, New York

U.S.D.J.

18